# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# AT LOUISVILLE

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Mariola Hernandez having been duly sworn, state;

1. I make this affidavit in support of an application under Rule 4.1 of the Federal Rules of Criminal Procedure for a complaint charging Stephanie M Russell with a violation of 18 U.S.C. § 1958. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have served in that capacity since June 2021. By virtue of my employment with the FBI, I am authorized to conduct investigations into violent crimes in violation of Title 18 of the United States Code, including 18 U.S.C. § 1958 involving the Use of Interstate Commerce Facilities in the Commission of Murder-For-Hire. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, § 2510 (7) and am empowered to conduct investigations of and to make arrests.

2. While employed by the FBI, I have been assigned as the primary investigator and have also assisted on cases involving carjacking, business robberies and other violent acts. As such, I have initiated and/or participated in investigations involving violent crimes. I have conducted or participated in surveillance, the execution of search warrants, the operation and debriefing of informants, and have reviewed taped conversations relating to a numerous crimes.

3. The statements contained in this affidavit are based in part on information I have learned through my own investigation, experience, and background as an FBI Special Agent. The statements are also based on information gained from other law enforcement officials and individuals who have assisted in this investigation. Not every fact known has been placed in this affidavit. This affidavit is being submitted for the purpose of a criminal complaint. I have not included each and every fact known to me concerning this investigation.

1

## Offenses Being Committed

4.  Affiant has probable cause to believe that Stephanie M. Russell has committed a violation of 18 U.S.C. § 1958 (Use of Interstate Commerce Facilities in the Commission of Murder for Hire). Section 1958 provides, in part:

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or conspires to do so, shall be … imprisoned for not more than ten years…
>
> A "facility of interstate or foreign commerce" includes means of transportation and communication. 18 U.S.C. § 1958(b)(2).

## Facts Establishing Probable Cause

5.  On November 25, 2019, Louisville Metro Police Department (LMPD) Detective Samantha Ernst met with Federal Bureau of Investigation (FBI) Special Agent (SA) Zachary Harrison. Ernst serves in the Crimes against Children Unit (CACU). In the course of her investigative duties, Detective Ernst believed she had uncovered a murder for hire plot during her investigation into child abuse allegations reported by Stephanie RUSSELL (RUSSELL) against her ex-husband Rick CRABTREE (CRABTREE).

6.  Detective Ernst interviewed CRABTREE as part of her investigation. During this interview, CRABTREE stated he believed RUSSELL was attempting to hire an assassin to kill him in order to take full custody of their two children. CRABTREE's attorney produced a sworn affidavit from K.S., a former nanny for the couple's child, in which K.S. stated she was approached by RUSSELL on multiple occasions in which RUSSELL alluded to getting rid of

CRABTREE. Initially, K.S. assumed RUSSELL was joking, until RUSSELL asked K.S. if she knew "really bad people" who could get rid of CRABTREE. RUSSELL went into additional details with K.S. on preferred timing and locations of the would-be murder of CRABTREE.

7. Once SA Harrison was made aware of these accusations, he conducted multiple interviews of individuals who may have had knowledge of this plot. The interviews did not provide any investigative leads for SA Harrison to continue his investigation. Unable to corroborate CRABTREE's accusations, the FBI discontinued the investigation. The CACU investigation of RUSSELL's allegations of child abuse against CRABTREE was closed when Detective Ernst found no evidence supporting RUSSELL's claims against CRABTREE. Ultimately, as part of their divorce, CRABTREE was awarded custody of the couples' two children, and RUSSELL has supervised visitation two days a week.

8. On March 28, 2022, FBI Louisville was referred to a private investigator by LMPD Detective Scott Claxon. The private investigator had potential information regarding a murder for hire plot by RUSSELL.

9. The private investigator was made aware of the murder for hire plot by a Cooperating Witness (CW). The CW works at Kidz Life Pediatrics, located at 10639 Meeting Street #101, Prospect, Kentucky. Kidz Life Pediatrics is owned by RUSSELL who is the Medical Doctor for the pediatric office. The private investigator learned that RUSSELL had allegedly approached several employees in her medical practice about helping locate someone to kill her ex-husband, CRABTREE. The private investigator advised CW he/she needed to contact the FBI to report the incident.

10. SA Mariola Hernandez and SA Preston Hoke interviewed the CW on April 6, 2022. CW indicated that between July 2021 and March 2022, RUSSELL approached two nurses

at the business on separate occasions and asked each of them for assistance in killing CRABTREE. The CW had received screen shots from one of these individuals (hereafter, CW2) of a text message conversation between CW2 and RUSSELL, in which RUSSELL asked CW2 for assistance in killing her ex-husband. The CW provided screen shots of these text messages to the Affiant.

11.  In the text messages, RUSSELL discussed hiring someone to deliver "Christmas flowers." CW advised "Christmas flowers" was code for killing CRABTREE. CW knew this to be code for killing CRABTREE because CW2 explained the meaning of "Christmas flowers" to him/her. CW2 told CW RUSSELL had decided on using the term "flowers" when discussing her ex-husband's death to make the messages appear discreet.

12.  In the text messages, RUSSELL and CW2 agreed to a payment of $4,000 to deliver "Christmas flowers."  CW2 represented to RUSSELL that the person who would deliver the "flowers" was a male friend from CW2's past.  RUSSELL provided CW2 with dates and times CRABTREE would not have their children so CW2 could provide this to his/her friend. RUSSELL begged CW2 for the "flowers" to be delivered before Christmas. CW2 later informed RUSSELL his/her friend, who could have killed CRABTREE, was killed himself and could no longer assist RUSSELL. RUSSELL then asked CW2 if there was anyone he/she knew who could complete the task, to which CW2 responded no.  RUSSELL asked CW2 if he/she had done this

in the past, and could help her.  Text messages provided by the CW appear below:



13.     CW stated RUSSELL does not usually use cash. He/she has usually seen RUSSELL paying with credit cards. However, CW believes RUSSELL does have some cash from items RUSSELL has been selling at the practice recently. These items have included RUSSELL's children's clothes.

14.     On April 21, 2022, SA Hernandez and SA Nicholas Bullard interviewed CW2. CW2 stated RUSSELL initially approached him/her in July 2021 asking for assistance in killing her ex-husband. RUSSELL claimed CRABTREE sexually abuses their children. Around October or November of 2021, RUSSELL reapproached CW2 and asked if he/she knew anyone that would kill CRABTREE. RUSSELL asked CW2 numerous times in person and via text messages. During these conversations, RUSSELL initially used her personal cellphone 502-331-

2977 ("Cellphone 1"). Shortly after, RUSSELL informed CW2 she had obtained what she described as a "burner phone" with the number 213-435-1902 ("Cellphone 2"). RUSSELL told CW2 she obtained Cellphone 2 specifically to discuss killing Crabtree. RUSSELL also explained "flowers" in person to CW2, which CW2 knows to mean the murder of CRABTREE.

15. Between December 5, 2021, and December 28, 2021, CW2 and RUSSELL conspired to kill CRABTREE via text messages on Cellphone 1 and Cellphone 2. On December 8, CW2 told RUSSELL he/she knew someone from his/her past who could potentially kill CRABTREE. RUSSELL asked how much this individual would charge for killing CRABTREE. CW2 told RUSSELL it would cost $4,000 and the money could be paid once the job was completed. RUSSELL agreed and stated she would pay an additional $1,000 if it could be done by the week of December 12, 2021. RUSSELL told CW2 she wanted CRABTREE dead so she could gain full custody of her children. RUSSELL did not care what method was used to kill her ex-husband.

16. CW2 stated he/she attempted to end the conversations with RUSSELL by stating the alleged hitman had died. RUSSELL asked if CW2 would pull the trigger themselves. Witness 2 declined, and soon after, left the practice. CW2 sent CW pictures of the text messages after finding out that RUSSELL had also approached another employee (Employee 1) in March of 2022, who is a former nurse at Kidz Life Pediatrics.

17. CW2 explained to Agents that when RUSSELL initially asked CW2 for assistance, CW2 thought RUSSELL was joking. CW2 went home and informed his/her spouse of RUSSELL's intentions, to which CW2's spouse convinced CW2 to continue conversing with RUSSELL about the plot to determine if RUSSELL was serious. Later, CW2 told RUSSELL the hitman he/she knew of had "died" and could no longer assist RUSSELL. CW2 stated whenever

6

he/she realized RUSSELL was very serious about having CRABTREE killed he/she ceased contact with RUSSELL and quit the business.

18. CW2 provided verbal and written consent to search his/her phone and retrieve text messages between RUSSELL and him/her. CW2 advised he/she texted RUSSELL about the murder for hire plot on both of RUSSELL's phone numbers (Cellphone 1 & 2).

19. After completing the data extraction from CW2's phone, Agents observed the same messages they had seen previously, which had been shared with CW by CW2 including the screenshots shown above. There were also text messages between CW2 and RUSSELL in which

RUSSELL had informed CW2 she was at home, which law enforcement knows to be the Premises, conspiring to kill CRABTREE using Cellphone 2. These screenshots are shown below:





20. On April 28, 2022, CW re-contacted SA Hernandez and advised RUSSELL had again reached out to a Kidz R Life employee about killing her husband. CW knew this because the employee had just contacted CW2 again and advised that RUSSELL was still asking about

9

locating someone to kill her husband. The employee sent screen shots of these recent messages to CW, who in turn provided them to the FBI. The screenshot shared is displayed below:



21. On May 11, 2022, CW2 contacted RUSSELL via text message on Cellphone 1. RUSSELL informed the CW2 she was still looking for "flowers." RUSSELL asked the CW2 if

he/she would be willing to meet in person to discuss flowers, to which the CW2 agreed. A portion of the text conversation between the CW2 and RUSSELL is shown below:



22.     On May 12, 2022, RUSSELL and the CW2 met at a business to discuss "flowers." RUSSELL told CW2 that CRABTREE was abusing their children. RUSSELL then stated she could really use some flowers, which the CW2 knows to mean the murder of CRABTREE because RUSSELL had told him/her so.  CW2 gave RUSSELL a telephone number for FBI Undercover Employee 5029 (UCE-5029) and identified him as someone who would kill her ex-husband. CW2 informed RUSSELL his/her contact was from Illinois and would travel

11

from there to complete the job. RUSSELL wrote down the name and phone number of the UCE provided by CW2. This meeting was audio and video recorded.

23. On May 15, 2022, RUSSELL reached out to UCE-5029 via a telephone call, using cellphone number 502-919-2250 ("Cellphone 3"). Affiant believes Cellphone 3 to be another phone purchased by RUSSELL which is being used by her to discuss criminal activity discreetly and to avoid giving the UCE her personal cell number, Cellphone 1.

24. The call between RUSSELL and the UCE was audio recorded. RUSSELL informed UCE-5029 she was looking to find someone who would get rid of CRABTREE. UCE-5029 asked if she wanted CRABTREE killed, to which RUSSELL responded that she wanted him gone. UCE-5029 then asked how she would want it done. RUSSELL responded she would rather discuss methods in person. RUSSELL offered to meet UCE-5029 in Indiana, after stating she knew he/she was approximately four and a half hours away from Louisville. RUSSELL and UCE agreed to a payment of $5,000 to get rid of CRABTREE. UCE-5029 and RUSSELL terminated the call a short time later. RUSSELL proceeded to send text messages to UCE-5029 with the name, address and type of vehicle CRABTREE drove. RUSSELL also informed UCE-5029 that CRABTREE had multiple cameras in his home.

25. On May 16, 2022, RUSSELL called UCE-5029 using Cellphone 3. The call was recorded via audio recording by UCE-5029. RUSSELL asked UCE-5029 if CRABTREE could be killed on or before Friday, May 20, 2022, due to it being the last day of school for their children. RUSSELL also stated the murder could occur during her visitation with her children on

Sunday May 25, 2022. RUSSELL did not want her children to be present when CRABTREE was killed.

26. During the phone call, RUSSELL and UCE-5029 also discussed the method she wished UCE-5029 would enact to kill CRABTREE. RUSSELL wanted UCE-5029 to make it appear as if CRABTREE committed suicide. Initially, RUSSELL asked for UCE-5029 to hold RUSSELL hostage and force him to text her an apologetic suicide note before being killed. UCE-5029 explained to RUSSELL he/she would not complete this task but would text her from RUSSELL's phone a suicide note, after UCE-5029 had killed CRABTREE. RUSSELL advised CRABTREE's phone has a biometric lock code, so UCE-5029 would have to use CRABTREE's face after his death to unlock his phone. RUSSELL told UCE-5029 she would provide him/her with the suicide note she wished for UCE-5029 to text her from CRABTREE's phone once he was killed. RUSSELL informed UCE-5029 she had been vocal about her hate towards CRABTREE to a lot of people and was worried she would look guilty, which is why she requested the suicide note. While RUSSELL did not use the word "kill" in her text communications with UCE-5029, during their telephone conversations she no longer used the coded language, or references to "flowers" that she had used in earlier communications with others. She was explicit that she wanted CRABTREE dead and that it should made to appear that he had committed suicide to avert suspicion from RUSSELL.

27. RUSSELL told UCE-5029 CRABTREE possessed multiple guns and he had at least $10,000 in a safe. RUSSELL told UCE-5029 the $10,000 from CRABTREE's safe could be kept by UCE-5029 as part of his payment. RUSSELL and UCE-5029 agreed to a new payment amount of $7,000 since UCE-5029 was accommodating her request by making it appear as a suicide. RUSSELL agreed to pay $3,500 to UCE-5029 on May 18, 2022, and an additional

$3,500 once the murder was completed. While on the telephone discussing the payment, UCE-5029 could overhear RUSSELL counting money while UCE-5029 was on the phone with her. RUSSELL also informed UCE-5029, while counting, that she was counting the money at her residence, which Affiant knows to be the PREMISES. After completing the count, RUSSELL informed UCE she was $20 short of $6,000 after counting the money out but would obtain the rest of the amount later once the job was completed. RUSSELL told UCE-5029 the cash she possessed she had obtained by selling items because she had hoped one day she would find someone to follow through with killing her husband.

28.     On May 18, 2022, RUSSELL sent UCE-5029 a text message that she had placed the first half of his/her payment, $3,500, into the outside lab specimen drop boxes on the rear doors of her office, located at 10639 Meeting Street, Louisville, Kentucky. RUSSELL also provided the code to UCE-5029 so he/she could unlock the box and retrieve the payment.

29.     At approximately 7:30 pm, on May 18, 2022, UCE-5029 traveled to Kidz Life Pediatrics to retrieve the currency RUSSELL had stated she placed within the specimen box behind the building. Prior to UCE-5029's arrival, RUSSELL told UCE-5029 she would be visiting her children between 5 to 7 pm. The FBI had set up surveillance outside the rear of Kidz Life Pediatrics to observe the specimen boxes RUSSELL had placed the money in. RUSSELL was observed entering and exiting the business numerous times. At one point, pre-surveillance investigators observed RUSSELL and her juvenile children together. But at the time surveillance was set up, and UCE-5029 arrived to pick up the payment, an envelope containing the $3500 had already been placed in the specimen box. Investigators did not observe

RUSSELL actually place the envelope in the specimen box, but she appeared to be the last person who left the office on May 18, 2022, and no other person left after RUSSELL.

30. On May 18, 2022, UCE-5029 arrived at the business and retrieved the agreed upon $3500 from the specimen box on the rear door of Kidz Life Pediatrics.

## Conclusion

31. Based on the evidence gathered in this investigation, Affiant believes there is sufficient Probable cause to arrest STEPHANIE M. RUSSELL for violation of Title 18, United States Code, Section 1958 involving use of Interstate Commerce Facilities in the Commission of Murder For Hire).

_____
Mariola Hernandez
Special Agent, Federal Bureau of Investigation

Sworn to me and subscribed by telephone in accordance with Fed. R. Crim. P. 4.1 and 41(d)(3) this 19th day of May, 2022.

_____
REGINA S. EDWARDS
United States Magistrate Judge